**\*NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                          :
HENRY GAINEY,                             :
                                          :        Civil Action No. 10-1912 (FLW)
                 Plaintiff,               :
                                          :
        v.                                :
                                          :            **OPINION**
MICHAEL J. ASTURE, COMMISSIONER OF        :
SOCIAL SECURITY,                          :
                                          :
                 Defendant.               :
_____:

**WOLFSON, United States District Judge**:

     Henry Gainey ("Plaintiff") appeals from the final decision of the Commissioner of Social Security (the "Commissioner"), denying Plaintiff disability benefits under the Social Security Act ("the Act"). The Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). On appeal, Plaintiff contends that he is entitled to disability insurance benefits under §§ 216(i) and 223(d) of the Act. Specifically, Plaintiff maintains that the Administrative Law Judge ("the ALJ"), at Step Three of the sequential process, erroneously found that Plaintiff did not meet the listed impairment of section 12.04, and that Plaintiff's impairments could not be combined to meet any other listed impairments. Plaintiff also contends that the ALJ erroneously concluded that the Plaintiff's residual functional capacity ("RFC") allowed him to perform sedentary work activity. After reviewing the administrative record, this Court finds that the ALJ's decision is based on the substantial evidentiary support required by 42 U.S.C. § 405(g). Therefore, the ALJ's decision is affirmed, and Plaintiff's appeal is dismissed in its entirety.

## I. Overview

### A. Procedural History

Plaintiff filed an application for Social Security disability benefits on February 9, 2005. This application included claimed disability of discogenic and degenerative disorders of the spine from March 1, 2002. The Social Security Administration ("SSA") denied the claim on May 20, 2005. Plaintiff did not appeal this decision.

Plaintiff filed another application for disability benefits on January 5, 2007, claiming disability beginning on March 1, 2002. The SSA denied the claim on April 24, 2007, and did so again on September 14, 2007. After the denials, Plaintiff filed a request for a hearing before the ALJ on October 3, 2007. Subsequently, the ALJ denied Plaintiff's request on January 29, 2009. In his decision, the ALJ, applying the doctrine of *res judicata*, limited the period of Plaintiff's disability from March 20, 2005 to May 30, 2007, since Plaintiff's previous disability claims were denied on March 20, 2005, and his benefits ran until May 30, 2007. Importantly, this period of claimed disability is not in dispute on this appeal. The Appeals Counsel affirmed the ALJ's decision on February 23, 2010. Thereafter, Plaintiff filed the instant action.

### B. Background

Plaintiff was born on October 28, 1958. Administrative Record ("AR") 29. Before Plaintiff stopped working, he held jobs as an organizer of boxes in a warehouse, a machine operator at a napkin factory, and a restaurateur. AR, 34-36, 283. Plaintiff stopped working some years after sustaining an injury to his back in 1998. AR, 214. He claims that he is currently unable to do much of anything except mild housework. AR, 42. His current symptoms include numbness in his limbs, pain in his neck and back, headaches, and depression. AR, 37-39, 40, 45-

47.  In addition, Plaintiff claims an inability to concentrate and sleep. AR, 42-43, 41.  Currently, Plaintiff is prescribed Lyrica and Hydrocodone. AR, 40.

### C. Medical Evidence Prior to May 20, 2005[1]

Mr. Gainey injured his neck in February 1998 while lifting boxes at his job. AR, 214.  Upon seeing Dr. Hasserl in June of 1998, Plaintiff reported pain in his right upper extremity, in addition to the pain in his neck.  AR, 214.  An MRI revealed a herniated disk on the left side of C5-6, and there was also some evidence of neural compression. AR, 214.  A course of physical therapy was prescribed, in addition to anti-spasmodic and anti-inflammatory medications. AR, 215.

Plaintiff visited Dr. Arthur Canario on September 13, 2001, and later visited Dr. Walsh on November 25, 2002. AR, 239, 242.  Both doctors reported that Plaintiff was experiencing pain in his neck and low back, with pain and numbness moving toward the limbs. AR, 239-240, 244. A range of motion test showed restriction on all planes for the cervical spine. AR, 240. [2] A similar range of motion test for his lumbar spine also showed restrictions, and a straight leg lift at 90 degrees produced pain in his lower back. AR, 240, 245.[3]  Despite these limitations, however, reflexes for both the arms and legs were normal, and motor and sensory abilities were also within an acceptable range. AR, 240, 244.  An MRI showed a left sided disc herniation at the cervical

---

[1]      In the period prior to March 20, 2005, Plaintiff saw a number of doctors, and received treatment from them. The ALJ specifically stated that a discussion of prior medical evidence would not function as a reopening of Plaintiff's previously denied disability claims, but merely functioned as background.  AR, 8.  Accordingly, this court will recount this evidence for the purpose of background information.

[2]      Specifically, Dr. Walsh noted 30 degrees of flexion, with 60 being normal; 35 degrees of extension, with 75 being normal; and 60 degrees of left rotation and 20 degrees of right rotation, with 80 being normal for both. AR, 244.

[3]      Dr. Walsh reported that the lumbar had 40 degrees of flexion, with 60 being normal; 10 degrees of extension, with 25 being normal; 15 degrees side bending, with 25 being normal; and 20 degrees rotation, with 30 being normal.  AR, 245.

spine and degenerative changes in the lumbar spine at L4-5. AR, 241.  Dr. Canario estimated a disability of 7.5% in the cervical spine, with a low probability of improvement with surgery, and a 2.5% disability in the lumbar spine. AR, 241.  Dr. Walsh noted that Plaintiff had a normal gait, normal heel/toe progression, and was able to perform a half squat limited by low back pain. AR, 244. Dr. Walsh also reported paresthesia in the left and right upper extremities, and weakness in Plaintiff's grip. AR, 244.  Tinel and Phalen signs were negative. AR, 244.

On June 2, 2004, Dr. Goldstein examined Plaintiff.  AR, 290.  Dr. Goldstein reported that Plaintiff walked with a normal gait. AR, 290. Plaintiff had reflexes of 2+ bilaterally in the biceps, triceps, knees, and ankles, and his sensory/motor functions were intact.  AR, 290.  Dr. Goldstein noted that the disc abnormalities were of questionable clinical significance, and that his symptomology did not correlate with such abnormalities under objective testing. AR, 290.  These findings led Dr. Goldstein to conclude that no specific work injury could explain the symptoms experienced by Plaintiff.  AR, 291. Dr. Hartwell reached a similar result earlier on January 21, 2004. AR, 284. He concluded that Plaintiff had no "objective signs" of impairment, and that he had a disability of 16%, including the lumbar and cervical pains.  AR, 284. As a result, Dr. Hartwell deemed Plaintiff to be capable of sedentary to light duty work.  AR, 284.

On the other hand, Dr. Lawrence Eisenstein, a neuropsychiatrist, concluded that Plaintiff was 100% disabled after an examination on March 8, 2005. AR, 301. Dr. Eistenstein noted paravertebral tenderness in the cervical region and pulling in the back of the neck on chin to a chin to chest maneuver. AR, 300. A pinprick test then revealed a diminution of capacity in the right upper extremity from C3 to C6. AR, 300.  Another pinprick test revealed a diminution of capacity in L4, L5, and S1 in the right lower extremity, and in L5 of the left lower extremity. AR, 300. Dr. Eisenstein concluded that Plaintiff had evidence of radiculopathy, both in the

4

cervical and lumbosacral region.  AR, 300.  These conclusions led the doctor to find that Plaintiff had a 37.5% disability in the cervical region, and a 37.5% disability in the lumbosacral region. AR, 300. Furthermore, Dr. Eisenstein found that the Plaintiff suffered from depression with anxiety, with worry about the future, decreased self-image, irritability, and isolation.  AR, 301. Dr. Eisenstein's findings of psychological impairments led him to conclude that Plaintiff had a 30% psychological disability.  AR, 301.

### D. Medical Evidence between May 20, 2005 and March 30, 2007

Dr. Martin Berlin conducted a psychological examination of Plaintiff on June 6, 2005. AR, 473.  Plaintiff reported that he reached the 12th grade, but did not graduate, and that after his injury, he was unable to lift more than twenty pounds.  AR, 473.  The test result showed an IQ of 98, which is within the normal range.  AR, 474.  Plaintiff also demonstrated age appropriate social understanding, and average scores on recall of school related facts.   AR, 474. Additionally, Dr. Berlin administered the Cornell Psychiatric Index, which showed no history of seizure disorder or psychiatric hospitalization or underlying emotional overlay.  AR, 473.  In the same exam, Plaintiff was administered the Bender Motor Gestalt Test.   AR, 474.   The reproductions made by Plaintiff were within acceptable limits.  AR, 474.

In January 2006, six weeks after a cervical discectomy and fusion at the C4-5, Dr. Gordon Donald noted "good resolution" of Plaintiff's symptoms, and ordered physical therapy. AR, 444.  In February 2006, Dr. Donald reported that neurologically, Plaintiff was normal, and that his radicular symptoms are completely resolved.  AR, 529.  He also noted that the fusion and discectomy surgery resulted in "excellent reconstitution of disk space height and segmental lordosis." AR, 529.  Dr. Donald, however, reported a continuation of pain in Plaintiff's neck with extension, leading the doctor to recommend cervical facet blocks.  AR, 529.

In March 2006, Plaintiff underwent steroid injections and facet blocks into the C3-4, C4-5, and C 5-6 joints by Dr. Serge Menkin, M.D. AR,  523-26.  In April 2006, Plaintiff also received a transforaminal epidural steroid injection.  AR, 516.

On April 19, 2006, Dr. Donald again examined Plaintiff, and noted that Plaintiff had a brief resolution of neck pain, which returned to its previous 7/10 level.  AR, 513.  Dr. Donald reported c/o bilateral hand tremors/spasms that have been present for several weeks.  AR, 513. During the examination, Plaintiff complained of his lower back pain, which had apparently spread to his right leg.  AR, 514.  Dr. Donald prescribed Lyrica and repeated C6 steroidal injections.  AR, 514.  Eventually, on May 31, 2006, Dr. Donald recommended repeat left C4-5, C6-7 facet injections, in addition to Lyrica and Celebrex.  AR, 508. The doctor indicated that Plaintiff might be a candidate for radiofrequency neurotomy.  AR, 508.

Plaintiff again underwent facet block surgery, as well as radio denervation in August 2006, which produced a 90% improvement in pain for several days.  AR, 501, 503.  Dr. Donald stated that there was mild tenderness to palpation on the right cervical paraspinal area, with no tenderness on the left. AR, 501.  Neck flexion and extension, however, caused severe pain, which radiated into the shoulders. AR, 501. Movement and compression of the neck still produced pain, and range of motion was only slightly increased. AR, 501.  Reflexes were +1, with 5/5 manual strength in the bilateral upper extremities.  AR, 501. Dr. Donald opined that Plaintiff was still suffering from mostly cervical discogenic mediated pain, and that the best course of treatment would be intravertebral distraction therapy with DRX 9000. AR, 502.  The doctor prescribed Flexeril for spasms and Celebrex for inflammation. AR, 502.

Plaintiff visited Dr. Menkin on February 2007 to review his progress after the denervation.  AR, 497.  Dr. Menkin reported that there was tenderness over the lower cervical

paraspinals and over the C7 and T1 spinous processes.  AR, 497.  Overall, however, Plaintiff reported that he was doing better, with pain down to 5/10 on a visual scale and improved headaches.  AR, 497.  The doctor prescribed use of Vicodin and Flexeril, and stated that Plaintiff might be a good candidate for denervation of C8.  AR, 497.

The SSA requested a consultative examination by Dr. Ronald Bagner on March 17, 2007.  AR, 343.  The doctor reported that Plaintiff was 252 pounds, with blood pressure of 130/86.  AR, 343.   He also stated that Plaintiff walked with a slow, cautious gait; gets up off the examination table with some difficulty; but was not uncomfortable sitting, dressing, and undressing for the examination.  AR, 343.  Plaintiff had cervical flexion of 30 degrees, extension of 20 degrees, lateral rotation of 50 degrees, and lateral flexion to the left and right of 20 degrees.  AR, 343.  Pain was produced within the entire range of motion.  AR, 343.  For Plaintiff's back, Dr. Bagner reported normal flexion, tension, and lateral flexion, but reported pain on movement.  AR, 344.  There was pain on straight leg raising on the left at 60 degrees in the lying and seated position, and pain on straight leg raising to 60 degrees in the lying and seated position. AR, 344.  There were reflexes of +1 on bilateral upper extremity movement, with grip strength of 5/5.  AR, 343.  Finally, the doctor concluded that Plaintiff had cervical radiculopathy and lumbar radiculopathy.  AR, 344.

Dr. Zulfiqar Rajput also conducted a consultative examination at the request of the SSA on March 20, 2007.  AR, 347.  The doctor concluded that Plaintiff was calm and cooperative; that he had normal motor activity; and that he was awake, alert, and oriented to person, place, month and the year. AR, 348.  However, Plaintiff's mood was dysphoric and his affects were constricted.  AR, 348.  Dr. Rajput also found that Plaintiff's thought processes were logical and goal oriented, and that Plaintiff did not suffer from hallucinations, delusions, or paranoia.  AR,

348.   Plaintiff was unable to do serial 7's, but could spell "table" forward and backward with "only 3 correct responses." AR, 348.   His knowledge concerning the president was 3 out of 3, and his ability to immediate recall was 3 out of 3.   AR, 348.   Short-term memory allowed Plaintiff to recall 1 out of 3 after 5 minutes, and his long-term memory was normal.   AR, 348.   In addition, Plaintiff's abstraction, insight and judgment, were all normal.   AR, 348.

While Dr. Rajput stated that Plaintiff suffered from major depressive disorder that is recurrent and severe, AR, 349, he also stated that the prognosis for this depression was good as long as he sees a psychiatrist and takes medications for depression.   AR 349.   Plaintiff's global assessment of functioning was assessed at 50.   AR, 349.

Plaintiff's April 3, 2007 examination by Dr. Michael Britton, a consultant for the New Jersey Division of Disability Determination, also showed that Plaintiff suffered from depression. AR, 353.   Plaintiff had moderate restriction of the activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, and pace. AR, 260.   However, Plaintiff could remember and carry out simple instructions, adapt to supervision and changes in routine, and had sufficient concentration, persistence, and pace for simple tasks.   AR, 364-65.

On April 12, 2007, Dr. Cirillo, a consultant for the New Jersey Division of Disability Determination, examined Plaintiff's physical functionality.   AR, 368.   He concluded that Plaintiff could occasionally lift 20 pounds, and frequently lift 10 pounds. AR, 369.   Plaintiff could also stand, sit, or walk for about 6 hours out of an 8-hour workday, and could push or pull an unlimited amount. AR, 369.   Additionally, Plaintiff could climb, balance, stoop, kneel, crouch, and crawl occasionally.   AR, 370.

By November 5, 2008, Dr. Donald had started Plaintiff on a track to decrease use of narcotic painkillers and other medications.  AR, 471.  Dr. Donald noted that Plaintiff continued to have chronic cervical radiculitis, but decided to move the patient towards non-narcotic painkillers, prescribing Lyrica, Vicodin, Ultram, and a Lidoderm patch, with a Tens unit and physical therapy. AR, 472.

### E. Testimonial Record

Plaintiff appeared before the ALJ on April 17, 2009. AR, 24.  Plaintiff testified that he lives with his wife and 9 year-old son. AR, 30. He described the pain in his back as a "stabbing pain, tingling, numbness." AR, 30. While at home, Plaintiff testified that going up and down the stairs is difficult, "like climbing a mountain," and such activity produces pain in his lower back and numbness in his legs. AR, 30. According to Plaintiff, this pain has worsened during the last 10 years. AR, 31.  On flat surfaces, Plaintiff can walk for 15 minutes before having to stop, or else he begins to limp and drag his leg. AR, 31. Standing for more than 3 to 5 minutes is also painful. AR, 32. He also testified that he has not had a license for about 10 years or more, preventing him from being able to drive, which further restricts his mobility. AR, 32.

Plaintiff also described the pain in his neck and arms. AR, 40.  According to Plaintiff, pain in his neck leads to migraines, which have occurred 3 to 4 times a week for the last 11 years. AR, 40. For his migraines and for the pain in his back and neck, Plaintiff stated that he has tried at least 15 to 20 different prescriptions. AR, 40.

Before the surgery on his neck in 2004, Plaintiff explained that his left arm was "going dead," and that he was experiencing numbness in both arms.  AR, 38.  After the surgery, although he has regained use of his arm, numbness and tingling still remains, and swelling in his hands is an everyday occurrence. AR, 38.

Plaintiff also testified that he was depressed and that he does not leave the house unless it is for his son's school events or karate classes. AR, 46.  However, Plaintiff stated that he is not on any sort of medication for these issues and that he does not see a psychologist or psychiatrist for them.  AR, 46.  Plaintiff further testified that other effects of his illness include an inability to sleep for long periods of time and a diminished capacity to focus and retain information. AR, 41-43.  Plaintiff stated that he normally sleeps from 3 to 4 hours at night, usually sitting up or lying on the floor, and will take a nap during the day if needed. AR, 41.  Plaintiff also stated that he was taking Vicodin or Hydrocodone with Lyrica prescribed by Dr. Donald. AR, 40-41.

The ALJ then called a vocational expert, Mr. Earhart. AR, 48.  Initially, the ALJ posed the following hypothetical:

> "If hypothetically I had an individual [of] a similar age, education, and past work experience as Mr. Gainey, and if I were to find that that individual would not be able to exceed the demands of sedentary work…and if I were to also find that the individual would be restricted to performing jobs where he'd be required to understand and remember simple routine instructions, make simple work related decisions, and use some common sense…and be able to deal with only minor or few work changes in a routine work setting…can you give me any jobs that might fit that profile?"

AR, 52-53. Mr. Earhart answered with the possibility of parking lot cashier or order clerk, which are sedentary and unskilled. AR, 53.  According to Mr. Earhart, about 121,000 parking lot cashier jobs exist in the national economy, and 1,400 exist locally.  AR, 53.  Similarly, about 107,000 order clerk jobs exist in the national economy, and 1,500 exist locally. AR, 53.  The ALJ then modified the hypothetical to include the following limitation:

> "that the individual has difficulty using the dominant hand for fine manipulation, can hold, turn, and grasp objects some but not, could only do [fine] manipulation, handling, fingering about occasionally.  Would that rule out either the cash parking lot job or the order clerk job?"

AR, 53. Mr. Earhart answered that it would, and would further rule out any competitive employment.  AR, 54. Finally, the ALJ asked if the inability to maintain attention to tasks for

10

two-hour increments of time would have an impact on employment. AR, 54. Mr. Earhart again said that this would rule out any employment. AR, 54.

### F. The ALJ's Decision

The ALJ began by finding that the claimant met the insured status requirement of the Social Security Act on March 30, 2007. AR, 10. The ALJ went on to apply the five-step process in order to determine Plaintiff's disability status of. AR, 10. At Step One, the ALJ determined that Plaintiff had not engaged in substantial gainful activity between May 21, 2005 and March 30, 2007. AR, 10. At Step Two, it was determined that Plaintiff had the following severe impairments: depression and discogenic and degenerative disorders of the back. AR, 11. However, at Step Three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or medically equaled one of the listed impairments that would qualify for automatic disability status. AR, 17.

At Step Four, the ALJ found that Plaintiff had the residual functional capacity to perform sedentary work. AR, 18. However, Plaintiff's depression limited his ability to understand and remember simple instructions. AR, 18. Otherwise, Plaintiff had "sufficient concentration and pace to complete simple work tasks, to make simple work-related decisions and use common sense; and, in general, was able to deal with minor or few work changes in routine work setting." AR, 18. The ALJ noted that his determination was made after consideration of all objective medical evidence and other evidence. AR, 19. In that respect, Plaintiff's own statements about the intensity, persistence and limiting effects of these symptoms were deemed not credible to the extent that they are inconsistent with the residual functional capacity assessment in light of the objective medical evidence. AR, 19. In light of the evidence, the ALJ found that while the

determinable impairments could reasonably be expected to cause the alleged symptoms, the impairments would not preclude the performance of sedentary work. AR, 21.

As for Plaintiff's back injuries, the ALJ noted that Plaintiff reported to Dr. Hartwell that he only used over-the-counter analgesics in 2004, and that he told Dr. Walsh that he was self-employed as a restaurant owner in November 2002, even though he claimed that he stopped working in March 2002. AR, 19. Further, even though Plaintiff claimed that he slept poorly as recently as March 7, 2007, he told Dr. Donald that he was sleeping well at night; that his medication was working well; and that his neck pain was not severe, but localized to a small area and only occasionally eradiated into his left shoulder. AR, 20. Lastly, the ALJ noted that Plaintiff's examination with Dr. Bagner in March 2007, showed no signs of lumbar radiculopathy in the forms of muscle weakness, atrophy, reflex depression or sensory loss. AR, 20.

As for Plaintiff's depression, the ALJ found the limitations from the condition to have only mild effects on daily living and social functioning, with a moderate degree of limitation in concentration, persistence and pace. AR, 21. The ALJ noted that Plaintiff's mood, according to examination, was "steady with an appropriate affect." AR, 21. Also, Plaintiff showed age-appropriate social understanding, average intelligence and short-term attention span, average recall, and no disabling emotional overlay. AR, 20. A separate set of testing did show dysphoria and an inability to complete serial 7's, but also displayed a logical and goal directed thought process. AR, 20. The ALJ reasoned that Dr. Britton opined that while Plaintiff suffered from major depressive disorder, he was capable of understanding and remembering simple instructions, adapting to supervision and changes in routine, and completing work tasks with sufficient concentration, persistence, and pace. AR, 21. Finally, while Dr. Eisenstein's opinion

shows 100% disability, the ALJ found that it is so far from the prevailing medical evidence that it should be given reduced weight.  AR, 21.

The ALJ found that Plaintiff was unable to perform past relevant work. AR, 21. These findings were largely based on the opinions of the vocational expert, Mr. James Earhart, who said that Plaintiff's previous jobs were light and unskilled as a machine operator, medium and unskilled as a laborer, and medium and semi-skilled as an auto mechanic. AR, 21.

Moving to step five, the ALJ determined that the claimant was 48 years old, which is categorized as a "younger individual" for disability insurance. AR, 22.  The ALJ also found that Plaintiff did not complete the 12th grade and was capable of communicating in English. AR, 22. Finally, the ALJ considered the RFC, age, education, and work experience, and found that there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed. AR, 22. While the ALJ posed limiting hypothetical conditions that lead the vocational expert to conclude that Plaintiff would not be able to find competitive employment, the ALJ found that those limiting conditions were not present.  AR, 22. For these reasons, the ALJ concluded that, considering exertional and non-exertional limitations, Plaintiff was not disabled for the purposes of the Medical-Vocational Guidelines. AR, 22.

## II. Discussion

### A. Standard of Review

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); see Matthews v. Apfel, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding

questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); see Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings have support by such evidence, Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for that of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. See Simmonds v. Heckler, 807 F.2d 54, 58 (3d Cir. 1986).

**B. Standard for Entitlement of Benefits**

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. See 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); see Plummer, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §

14

423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. 42 U.S.C. § 1382c(a)(3)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. See 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he is not currently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a); see Bowen v. Yuckert, 482 U.S. 137, 146-47 n. 5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he/she is automatically denied disability benefits. See 20 C.F.R. § 404.1520(b); see also Bowen, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); see Bowen, 482 U.S. at 146-7 n. 5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." Id. A claimant who does not have a severe impairment is not considered disabled. 20 C.F.R. § 404.1520(c); see Plummer, 186 F.3d at 428. Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Sub pt. P., App. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4) (iii). If the claimant demonstrates that his/her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his/her burden of proof and is automatically entitled to benefits. See 20 C.F.R. § 404.1520(d); see also Bowen, 482 U.S. at 146-47 n. 5. If the specific impairment is not listed, the ALJ will consider in his/her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. See 20 C.F.R. § 404.1526(a). If there is more than one

15

impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. Id. An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. Williams, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he/she retains the residual functional capacity to perform his/her past relevant work ("PRW"). 20 C.F.R. § 404.1520(e); Bowen, 482 U.S. at 141. If the claimant is able to perform her previous work, the claimant is determined to not be disabled. 20 C.F.R. § § 404.1520(e), 416.920(e); Bowen, 482 U.S. at 141-42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. Plummer, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his/her previous work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." Bowen, 482 U.S. at 146-47 n. 5; Plummer, 186 F.3d at 428. This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled. Id.

### C. Plaintiff's Arguments on Appeal

In the instant matter, Plaintiff argues that the ALJ made three separate errors that would require this Court to reverse the decision of the Commissioner or, in the alternative to remand to the Commissioner for reconsideration. First, Plaintiff claims that the ALJ erred at Step Three because he incorrectly concluded that Plaintiff's impairment did not meet the requirements of

Section 12.04 of the listed impairments relating to depression. Next, Plaintiff argues that the ALJ erred by failing to properly consider the combined effects of Plaintiff's mental and physical impairments. Finally, Plaintiff claims that the ALJ erred by failing to consider the available evidence in determining Plaintiff's RFC.

### 1. The ALJ's Determination of Whether Plaintiff's Mental and Physical Impairments Met any of the Listed Conditions, Separately or Combined

Plaintiff argues that the ALJ, in considering whether Plaintiff's depression met the listed impairment in Section 12.04, failed to evaluate the evidence properly.  Alternatively, Plaintiff claims that the ALJ failed to consider his impairments in combination in order to meet one of the listed impairments.  Plaintiff, however, does not specify which listed impairment the combination of his physical and mental limitations should meet.

At Step Three, an ALJ must consider each of the claimant's individual conditions and determine whether they meet or equal any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1, that would give rise to a presumption of disability. Additionally, the regulations state that if the claimant has "a combination of impairments, no one of which meets a listing ... [the ALJ] will compare [the claimant's] findings with those for closely analogous listed impairments." 20 C.F.R. § 404.1526(b)(3). In order to find that a combination of impairments is medically equivalent to one in the listing, it must be "at least of equal medical significance." Id. The ALJ will thus review the record and determine whether the ailments in combination were equal to any of the enumerated impairments. 20 C.F.R. §§ 404.1520(d), 416.920(d).

It is well-established that an ALJ's conclusion that a claimant's impairments do not meet or equal any Listed Impairment without "identifying the relevant listed impairments, discussing the evidence, or explaining [the] reasoning" constitutes error requiring remand. See Burnett v. Comm'r of Social Security, 220 F.3d 112, 119 (3d Cir.2000). For example, in Burnett, the Third

Circuit found an ALJ's conclusory statement that the claimant failed to meet any listing "hopelessly inadequate" and remanded the case for a full discussion of the evidence and explanation of the ALJ's reasoning.  Burnett, 220 F.3d at 119-120.  In Jones v. Barnhart, 364 F.3d 501 (3d Cir.2004), the Third Circuit further clarified that the purpose of Burnett was to guarantee "sufficient development of the record and explanations of findings to permit meaningful review of step-three determinations. Jones, 364 F.3d at 505. Moreover, the Third Circuit noted that an ALJ is not required to "use particular language or adhere to a particular format in conducting his analysis," but that the decision "read as a whole" must be capable of providing meaningful judicial review. Id.

Here, the ALJ's finding at Step Three that Plaintiff's impairment did not match 12.04 is supported by substantial evidence.  Section 12.04 requires the Plaintiff to meet the conditions set forth under subsections A and B, or to meet the conditions under subsection C.  The ALJ found that Plaintiff failed to meet both the conditions of subsection B and C.  Plaintiff argues that in making such determinations, the ALJ did not properly consider the opinions of Dr. Eisenstein, as well as Dr. Rajput and Dr. Britton, all of whom diagnosed Plaintiff as being depressed.  Plaintiff relies on the diagnoses of Drs. Eisenstein, Rajput, and Britton for the proposition that a finding of depression alone should be sufficient to establish disability based upon depression under section 12.04.   Contrary to Plaintiff's position, the AJL did in fact consider these doctors' opinions.[4]

Under subsection B, Plaintiff would have to show two of the following:  marked restriction of activities of daily living; marked difficulties in maintaining social functioning;

---

[4]      While Dr. Eisenstein's examination on March 8, 2005, occurred before the beginning of the disability period in question, the ALJ nonetheless considered Dr. Eisenstein's diagnosis in making his determination.

marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  The medical evidence simply fails to show that Plaintiff met these requirements.  Although Dr. Rajput concluded that Plaintiff suffered from major depressive disorder, Dr. Rajput stated that Plaintiff had good ability to reason, and had goal-oriented thoughts. AR, 348.  Dr. Rajput also opined that Plaintiff could recall certain items immediately, and 1 out of 3 items after 5 minutes, and that Plaintiff had friends and socialized and interacted with his son. AR, 348-49. All of these observations led Dr. Rajput to ultimately conclude that Plaintiff's prognosis for his depression was good. AR, 349.  Similarly, Dr. Britton concluded that Plaintiff had moderate -- not marked -- restriction of the activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, and pace. AR, 260.  The doctor also opined that Plaintiff could remember and carry out simple instructions, adapt to supervision and changes in routine, and had sufficient concentration, persistence, and pace for simple tasks.  AR, 364-65.  Dr. Berlin's testing of Plaintiff also revealed no underlying emotional disorder, and an age appropriate social understanding, and average scores on recall of school related facts. AR, 473-74.    Indeed, Plaintiff's own testimony confirmed that he was, amongst other things, performing household activities, laundry, and cooking.  AR, 42 & 46.

Having considered these examinations, the Court finds that Dr. Eisenstein's March 8, 2005 examination is insufficient to establish that Plaintiff's depression constituted a disability under the impairment listing. While Dr. Eisenstein reported that Plaintiff was depressed, and that depression constituted a 30% disability, see AR, 301, Dr. Eisenstein did not provide any explanation of Plaintiff's ability to function in light of the depression.  Because this conclusory medical statement differs greatly from other various medical opinions, the ALJ correctly concluded that Dr. Eisenstein's testimony should be given reduced weight.  Not to mention, Dr.

19

Eisenstein's examination predates Plaintiff's disability period. Finally, Plaintiff points to no evidence of decompensation. Taking all the evidence into consideration, the Court finds that the ALJ correctly concluded that Plaintiff's depression did not qualify as a listed condition under 12.04.

Under subsection C, the Court finds that Plaintiff did not experience repeated episodes of decompensation of extended duration; does not have a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or changes in his environment would be predicted to cause him decompensation; and/or did not exhibit a current history of one or more years of inability to function outside of a highly supportive living arrangement, with an indication of continued need for such an arrangement. Plaintiff does not point to any evidence that would establish any of these factors, and indeed, the records of Plaintiff's physicians do not contain any opinions that would have led the ALJ to find that Plaintiff satisfied these conditions. See Giese v. Comm'r of Soc. Sec., 251 Fed. Appx. 799, 804 (3rd Cir. 2007). Accordingly, because the ALJ fully detailed the requirements of a listed impairment under 12.04 and the medical evidence to evaluate them, the Court finds that the ALJ did not err in concluding that Plaintiff failed to meet the listed requirements of section 12.04 impairment.

Moreover, while Plaintiff does not raise on this appeal that the ALJ erred in finding that Plaintiff's discogenic and degenerative disorders of the back did not meet any of the physical impairment listings, he nevertheless argues that the ALJ failed to consider the combination of his mental and physical impairments. The Court disagrees. Here, the ALJ's detailed analysis of the individual impairments and conclusion that Plaintiff did not have "an impairment or combination of impairments" that met or equaled a listing is sufficient. Mirabal v. Comm'r, No. 08-01079,

2009 U.S. Dist. LEXIS 129703 (D.N.J. 2009).  Indeed, where the ALJ has indicated that the impairments have been considered in combination, there is "no reason not to believe" that the ALJ did so. Morrison v. Comm'r of Soc. Sec., 268 Fed. Appx. 186, 189 (3rd Cir. 2008).  Indeed, there is no requirement that the ALJ should explicitly state that he considered Plaintiff's impairments both individually and in combination. See McQueen v. Comm'r of Soc. Sec., 322 Fed. Appx. 240, 242-43 (3d Cir. 2009); see also Mirabal, 2009 U.S. Dist. LEXIS 129703 at *20-21.

Here, the ALJ gave sufficient consideration as to the medical effect of the combination of Plaintiff's physical and mental impairments. As stated above, the ALJ need only sufficiently consider the individual impairments, and then find that Plaintiff's impairments considered in combination did not equal a listed condition. In that regard, the ALJ found that "no treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment." AR, 17.  The ALJ went into sufficient detail when considering whether Plaintiff's impairments met listed conditions, and the ALJ also gave a detailed recounting of Plaintiff's numerous treatments, dating back to 1998.  AR, 11-17. Indeed, the ALJ also stated that between May 21, 2005 and March 30, 2007, the "claimant did not have an impairment or combination of impairments that met or medically equaled one of the impairments in 20 CFR Part 404, Subpart P, Appendix 1." AR, 17.  These findings are sufficient to support the ALJ's determination that the combination of Plaintiff's impairments did not meet a listed condition.

In addition, the Court notes that the evidentiary burden is on Plaintiff at the Third Step, and Plaintiff has failed to identify which, if any, C.F.R. listing would be met or equaled by his combined impairments.  As a result, Plaintiff has failed to meet his burden of showing a listing

that the ALJ may have not considered or overlooked. See Poulos v. Comm'r, 474 F.3d 88, 92 (3d Cir. 2007).

### 2. The ALJ's Determination of Plaintiff's RFC

Plaintiff argues that the ALJ erred in determining his RFC because the ALJ did not consider certain medical and non-medical evidence. Specifically, Plaintiff posits that the ALJ should have considered Dr. Eisenstein's examination in connection with Dr. Donald's later opinions. Plaintiff also argues that his subjective complaints during his testimony before the ALJ were improperly considered. Finally, Plaintiff contends that the vocational expert's answers to the ALJ's hypothetical questions should have led the ALJ to find that Plaintiff is entitled to disability benefits.

Plaintiff's contention that the ALJ did not properly consider the evidence is unconvincing. In particular, Plaintiff contends that the ALJ should have considered the March 8, 2005 report of Dr. Eisenstein, along with the subsequent reports by Dr. Donald. Plaintiff further contends that those reports, in conjunction with his testimony, indicate that his condition has worsened. Indeed, "[a]n ALJ should give treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." Masher v. Astrue, No. 08-4850, 2009 WL 4573907, at * 4 (3d Cir. Dec.7, 2009) (quoting Brownawell v. Comm'r of Soc. Sec., 554 F.3d 352, 355 (3d Cir. 2008)). "Although the treating physician's opinion is generally given controlling weight, that opinion is entitled to controlling weight only when it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record.'" Bonanno v. Comm'r of Soc. Sec., No. 08-1709, 2009 WL 82694, at *2 (3d Cir. Jan.14, 2009) (citing 20 C.F.R. § 404.1527(d)(2)).

Here, as previously stated, the ALJ reviewed a broad range of medical evidence, dating back to Plaintiff's injury in 1998, and the ALJ detailed Plaintiff's progress until the time Plaintiff was last insured in May 2007.  AR, 11-17.  In determining Plaintiff's RFC, the ALJ specifically examined the findings of Dr. Donald in April 2007.[5]  Indeed, at that time, "Mr. Gainey [explained] to Dr. Donald . . . that his pain was generally a 3/10 on a scale of 1 to 10 with 10 being the worst." AR, 20.  Plaintiff reported to Dr. Donald that he was sleeping well at night, and that his medication was working well.  AR, 405.  Plaintiff also reported that his headaches were less frequent and severe.  Id.  With respect to Plaintiff's claimed lumbar pain, the ALJ considered Dr. Bagner's examination, which "failed to reveal any signs of residuals of lumbar radiculopathy in the form of muscle weakness, atrophy, reflex depression or sensory loss; and that the claimant had normal flexion, extension, and lateral flexion of the lumbar spin." AR, 20.

Next, the ALJ specifically stated that he would give reduced weight to Dr. Eisenstein's opinion that Plaintiff was 100% disabled, "insofar as it is inconsistent with the preponderance of medical evidence in the record," and that the assessment "was not based on a detailed, longitudinal relationship with the claimant." AR, 21. Indeed, no other doctors in the record made an estimate of Plaintiff's disability that comports with Dr. Eisenstein's findings.  As discussed above, many of the doctors opined that Plaintiff could perform a broad range of tasks, albeit with mild to moderate difficulties.  In addition, Dr. Eisenstein's examination of Plaintiff occurred outside of the disability period, which Plaintiff does not dispute.  Accordingly, the Court finds that the ALJ properly reduced the weight of Dr. Eisenstein's opinion.

---

[5]     The Court notes that in order to be entitled to disability insurance benefits, Plaintiff must be under a disability which commenced at a time when he met the insured status requirements for such benefits; i.e., before March 31, 2007.  See 42 U.S.C. § 423(a)(1)(A).  Accordingly, many of Dr. Donald's later reports do not pertain to the relevant period because Plaintiff's insured status expired on March 31, 2007.

Furthermore, Plaintiff's argument that the ALJ did not consider Plaintiff's subjective complaints is unpersuasive. While the ALJ must consider and weigh all of the non-medical evidence before him, including claimant's allegations of pain, see Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 122 (3d Cir. 2000), these allegations of pain and other subjective symptoms "must be supported by objective medical evidence." Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (citing 20 C.F.R. § 404.1529). The ALJ has the authority to make credibility determinations of a plaintiff's testimony, specifically with regard to pain and other subjective complaints. Malloy v. Comm'r of Soc. Sec., 306 Fed. Appx. 761, 765 (3d Cir. 2009) (citing VanHorn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)). In addition, rejection of subjective testimony must be based on substantial evidence in the record. VanHorn, 717 F.2d at 873-74. Furthermore, if the ALJ finds Plaintiff's description of pain is not credible, the ALJ must make a negative credibility determination regarding the degree of subjective pain alleged. Id. at 873. In that respect, when reviewing a decision by an ALJ, this Court must defer to the ALJ's determinations on the credibility of the witnesses and on whether the claimant has satisfied the burden of proof. See Horodenski v. Comm'r of Soc. Sec., 215 Fed. Appx. 183, 188-89 (3d Cir. 2007); Atlantic Limousine, Inc. v. NLRB, 243 F.3d 711, 718 (3d Cir. 2001) (Where the ALJ has articulated reasons supporting a credibility determination, that determination will be entitled to "great deference"); Davis v. California, 439 F.Supp. 94, 98 (E.D. Pa. 1977).

Indeed, here, the ALJ did consider Plaintiff's subjective complaints, but decided to give them "reduced credibility." AR, 19. Essentially, Plaintiff testified before the ALJ that his conditions have worsened over time and that he deals with depression every day. Having heard the testimony, the ALJ found that Plaintiff's statements "concerning the intensity, persistence

and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with [Plaintiff's] residual functional capacity assessment." AR, 19.  Additionally, the ALJ explained that "[Plaintiff] has some subjective limitations," however, the intensity, frequency, or duration of those limitations is not supported by the objective medical evidence.  Id.   The Court finds no error in the ALJ's determination.  Plaintiff's own statements to Dr. Menkin belie his argument: Plaintiff stated to Dr. Menkin in February 2007, that his pain was at a level of 5 out of 10, an improvement from a level of 7 out of 10, which Plaintiff informed Dr. Donald of in April 2006. AR, 497, 513. Similarly, Dr. Bagner stated that Plaintiff could sit, dress, and undress without discomfort. AR, 343. Accordingly, based on substantial evidence, the ALJ properly made a valid credibility determination as to the degree of Plaintiff's subjective complaints.

Finally, Plaintiff argues that the ALJ ignored certain portions of the vocational expert's opinion.  In particular, Plaintiff points to the hypothetical question posed by the ALJ, in which the ALJ asked the expert whether an individual with Plaintiff's conditions would be unable to perform jobs as a parking lot cashier or order clerk if that individual had difficulty using the dominant hand for fine manipulation and could only perform fingering and handling occasionally.  AR, 53-54.  Based on those questions, the vocational expert testified that the individual would not be able to perform those jobs.  Id.  Plaintiff contends that because his hands were often swollen, the ALJ's failure to consider that portion of the expert's opinion constituted error.

It is well-established that an ALJ is not required to "submit to the vocational expert every impairment alleged by a claimant. Instead the directive . . . is that the hypotheticals posed must 'accurately portray' the claimant's impairments and that the expert must be given an opportunity to evaluate those impairments 'as contained in the record.' . . . Fairly understood, such references

25

to all impairments encompass only those that are medically established." Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005).  Once a hypothetical is answered, however, the ALJ must only consider it as relevant if it is supported by the ALJ's RFC analysis. Johnson v. Comm'r of Soc Sec., 398 Fed. Appx. 727, 736 (3d Cir. 2010).  The vocational expert's opinion speaks to the ability of the plaintiff to be employed after an RFC analysis. Id. If the hypothetical restriction is obviated by the RFC determination, then it loses relevance. Id.

In the instant matter, Plaintiff's own subjective complaints regarding his swollen hands cannot be the sole basis for finding a disability.  See 42 U.S.C. § 423(d)(5)(A), 20 C.F.R. § 404.1529(a).  Plaintiff does not point to any medical evidence to support his contention that he is unable to perform fine manipulation.  Indeed, nowhere in the record is there any medical evidence that indicates that Plaintiff actually suffered from difficulty using the dominant hand for fine manipulation, and clearly, the ALJ did not make that determination.  Because there is no medical evidence to substantiate the hypothetical given to the vocational expert, the ALJ did not err by deeming it irrelevant in determining Plaintiff's disability status.

## III. Conclusion

For the reasons set forth above, the Court concludes that there is substantial evidence in the record to support the ALJ's determination that Plaintiff was not disabled between May 20, 2005 and March 30, 2007. Therefore, the ALJ's decision is affirmed.


DATED:  April 25, 2011                                    /s/ Freda L. Wolfson
                                                          Honorable Freda L. Wolfson
                                                          United States District Judge

26